IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| LISA LOCKETT ob/o N.G., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 05-3549-CV-S-ODS |
| ) | |
| JO ANNE BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING
SUPPLEMENTAL SECURITY INCOME BENEFITS

Pending is Plaintiff's[1] request for review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI") benefits. For the following reasons, the Commissioner's decision is affirmed.

I.  BACKGROUND

SSI benefits are not available for time periods prior to the filing of the application. Plaintiff filed her application in January 2003, but information prior to that time will be presented solely to present a complete background of Plaintiff's condition.

A.  Records of Medical and Mental Treatment

Plaintiff was born in September 1994.  In April 2001, her mother took her to Ozark Medical Center ("OMC") on recommendation of a sheriff's deputy; it had recently been discovered Plaintiff and her sister had been sexually assaulted by an uncle on numerous occasions over the course of approximately four months.  Plaintiff displayed increased violence at home but no problems at school.  R. at 224-25.  She denied

---

[1] References to "Plaintiff" are to the child on whose behalf benefits are sought.

thoughts of suicide or homicide, indicated she liked school, and was assigned a GAF score of 50 to 60.  R. at 226.  While plans were made for Plaintiff to receive therapy, she did not return to OMC until September 2002.  Plaintiff's "mother reported that [N.G.] is not showing previous disruptive behaviors of hitting, kicking, biting, and hitting her head on the wall.  She reports that she has not seen those behaviors in over a year.  She did report that [N.G.] is rebelling."  Plaintiff was also having difficulties with reading, spelling and concentrating.  During the past year, Plaintiff's mother and stepfather had both been hospitalized briefly for depression/bipolar disorders.  Plaintiff still professed to enjoying school and denied suicidal or homicidal thoughts (although her mother reported when Plaintiff becomes angry she expresses a wish that she die).  R. at 221-22.  Plaintiff was diagnosed as suffering from a chronic adjustment disorder and again assigned a GAF score of 50 to 60.  R. at 222-23.

On September 27, 2002, Plaintiff was admitted to Lakeland Regional Hospital after an apparent increase in violent activity and statements indicating she wanted to be dead.  She was discharged on October 7, 2002.  Her GAF was assessed at 30 when she was admitted and 80 when she was discharged.  R. at 166-67.

On November 6, 2002, Plaintiff was taken to the Burrell Behavioral Health Center ("Burrell") for assessment and therapy.  Plaintiff's mother reported Plaintiff had problems with anger, aggression, and following directions at school.  Plaintiff admitted to having suicidal thoughts in the past but denied having any at that time.  She was diagnosed as suffering from post traumatic stress disorder ("PTSD") and assigned a GAF score of 60.  It was believed Plaintiff's problems stemmed from a variety of matters in addition the sexual abuse, including her change of home and school (the family had recently moved from West Plains to Springfield), separation from her sister and unresolved issues involving her biological father.  R. at 180-83.  On January 6, 2003, Plaintiff began seeing Dr. Latha Venkatesh, a child and adolescent psychiatrist at Burrell.  Dr. Venkatesh recounted Plaintiff's history, observed she was good in math, science and art, confirmed the assessment of PTSD and assigned her a GAF score of 55.  Dr. Venkatesh also stated Plaintiff needed to continue individual and family therapy and might also require an antidepressant.  R. at 174-77.

2

Dr. Venkatesh continued to see Plaintiff on a regular basis. On March 19, 2003, Plaintiff's mother reported Plaintiff was "doing well - opening up well." She had not problems sleeping or eating and was doing well in school, appeared more spontaneous and cheerful and had no suicidal thoughts. Plaintiff was complaining of headaches and, in light of her biological father's history of migraines, Dr. Venkatesh suggested she be evaluated. Dr. Venkatesh also prescribed an antidepressant (Zoloft). R. at 240. By the next appointment on April 30, Plaintiff had regressed. She was not doing well in school; she lacked focus, fidgeted a lot, and left without notice. She was very defiant, had begun cursing, and was drawing "disgusting" pictures. Plaintiff was also having problems sleeping. Dr. Venkatesh speculated the "Zoloft may have triggered some mania" and replaced the Zoloft with Strattera (typically used to treat ADHD) and Abilify (typically used to treat schizophrenia, but used here to treat PTSD). R. at 238.

The next visit to Dr. Venkatesh (on May 23) revealed a marked improvement. Plaintiff was calmer and was not arguing, cursing, or fidgeting. She was eating well, sleeping well, and acting pleasant and friendly. The only side effect from medication was a dry mouth. R. at 237. On June 18, Plaintiff's mother again reported Plaintiff was "doing a lot better." R. at 236. On July 22, Plaintiff reported feeling sensitive to heat; Dr. Venkatesh provided a note directing the school place her closer to the air conditioning vent. In all other respects, the session revealed Plaintiff continued to be doing well on the combination of Strattera and Abilify. R. at 235. On August 18, Dr. Venkatesh wrote that Plaintiff "is doing well, sleeps well," had an episode of irritability that could be contained, had a positive mood and affect and no indication of suicidal thoughts or psychosis. R. at 234. On September 22, Plaintiff's mother reported Plaintiff was "an angel" at school but had been throwing temper tantrums at home. Dr. Venkatesh found no indication of thought disorders and increased Plaintiff's Abilify. R. at 233. Three weeks later, Plaintiff's mother reported there had been no temper tantrums since the last visit, Plaintiff was consistently on the honor roll at school. Plaintiff reported that she felt "happy." R. at 232.

On November 11, Plaintiff's mother reported that she wanted Plaintiff to stop taking Abilify because she believed it was causing Plaintiff's headaches. Dr. Venkatesh

expressed doubts about the relationship between Plaintiff's headaches and the Abilify (suggesting Plaintiff's failure to obtain glasses prescribed a year ago may be the true cause of the headaches) and cautioned Plaintiff's mother about symptom relapse if Abilify was stopped. Plaintiff's mother then confessed that she had already been reducing Plaintiff's dosage of Abilify without telling Dr. Venkatesh. Dr. Venkatesh increased Plaintiff's Strattera and cut the dosage of Abilify in half. R. at 231. At the next monthly visit, Plaintiff was still doing well overall, but reported occasional nightmares. R. at 230. On January 6, 2004, Dr. Venkatesh reported Plaintiff was back to the prior dosage of Abilify, was wearing glasses, and reported no migraines. She was doing well in school and had no major problems. R. at 229. Approximately two weeks later, Dr. Venkatesh completed an Individualized Functional Assessment ("IFA"). This is a "check the box" form indicating Plaintiff has marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, caring for herself and physical well-being. No narrative information was provided. R. at 192-95. On March 1, Dr. Venkatesh reported Plaintiff was sleeping well, doing well in school, having a stable, cheerful, goal-oriented mood, and no suicidal thoughts. R. at 228.

     Around this time period, Plaintiff moved back to West Plains and resumed visits to OMC. On March 31, 2004, the treating therapist was told of Plaintiff's symptoms dating back to 2000; however, much of the history described predates 2003 and the therapist noted many of Plaintiff's difficulties were alleviated with medication. R. at 217. Plaintiff "continues to meet the criteria for Attention Deficit Hyperactivity Disorder, combine type when she is not on her meds. When she is not on her meds she fails to pay close attention to details, she does not seem to listen when spoken to, she does not follow through on instructions, she is unorganized, she loses things, and she is easily distracted by extraneous stimuli." R. at 220. Plaintiff also was noted to have a "past history of PTSD symptoms" and was assessed a GAF score of 58 to 60. It was recommended that Plaintiff undergo therapy and receive medication. R. at 219-20. At some point Plaintiff was again prescribed Strattera because on May 12, 2004, Nurse Patricia Carson continued Plaintiff's prescription. Plaintiff's mother told Nurse Carson

4

Plaintiff had also been on Abilify but it caused migraines, so Nurse Carson did not prescribe it. R. at 251. On June 4, Plaintiff told Nurse Carson that she was sleeping wall and was not sad, and there was no report of recent problems. R. at 250.

Plaintiff had a therapy session with Lori Baker on June 10, 2004. Plaintiff expressed some concern about seeing her uncle, who coincidentally was also receiving treatment at OMC. The session focused on ways Plaintiff could handle an actual encounter with her uncle as well as ways to deal with anger. Plaintiff was not suicidal or homicidal. R. at 249. On July 16, Nurse Carson noted Plaintiff was doing well on the Strattera and Plaintiff acknowledged it was helping her concentrate. R. at 248. Therapy sessions with Ms. Baker were held on July 21 and August 18; nothing noteworthy was reported. Ms. Baker assessed Plaintiff's GAF score at 54-57 on both occasions. R. at 246-47.

## B. School Records

Plaintiff was in second grade for the 2002-03 school year. In February 2003, her teacher indicated Plaintiff was reading and writing at the kindergarten level and performing math at the first grade level. R. at 81. The teacher also wrote that Plaintiff's "inability to read grade-level materials makes all of her school work very difficult. She does better with oral instructions and information than written instructions . . . . Many times she knows information and can present it verbally but can't present it in writing." R. at 82. Plaintiff exhibited difficulties in concentration and staying on task, but this was due to her inability to comprehend what she was reading. R. at 83. The teacher reported no problems in the areas of interacting with others, moving about and manipulating objects, or caring for herself. R. at 84-86.

Plaintiff was held back in the second grade for the 2003-04 school year, and an Individualized Educational Plan ("IEP") was developed to address her reading deficiency. Although Plaintiff's mother expressed concerns about Plaintiff's behavior, the IEP indicates her "behavior does not seem to have an impact on her school achievement. [N.G.'s] teacher reports that [N.G.] is a very kind, caring student who

5

always puts forth her best effort." R. at 120. Plaintiff was not placed in special education or otherwise described as suffering from a learning disability; instead, she was provided accommodations for her reading deficiency and a plan for improving her ability in this area. However, for third grade she was to be placed in special education to help continue her improvement in reading skills. R. at 143-44, 147.

### C. Testimony

A hearing was held before the ALJ on October 19, 2004. Dr. Clayton Pettipiece testified as a medical expert that, based on his review of the file, Plaintiff suffered from ADHD and PTSD. The conditions were described as severe but not equal to any of the listed impairments. R. at 257. With respect to the six domains of development, Dr. Pettipiece testified Plaintiff had no limitations in the areas of attending and completing tasks, moving about and manipulating objects, caring for herself, or health or physical well-being, and less than marked limitations in her ability to interact and relate to others. R. at 258. When asked about Dr. Venkatesh's IFA, Dr. Pettipiece testified it was inconsistent with her treatment notes and therefore not supported by medical evidence. R. at 259.

Plaintiff's mother testified N.G. was fine in the mornings and "a little angel" at school, but after returning from a day of frustration at school she would be agitated and violent. R. at 260-61. According to Plaintiff's mother, Nurse Carson described Plaintiff as "a very, very, angry child." R. at 261. Plaintiff has difficulty concentrating and staying on task, cries a lot, fights with her sister, and has difficulty falling asleep. R. at 261-64. She also testified Plaintiff has thoughts of suicide and running away, a compulsive desire to be clean, and an unwarranted concern about her weight. R. at 265-68.

6

### D. The ALJ's Decision

In denying benefits, the ALJ discounted Dr. Venkatesh's IFA because it was inconsistent with her treating notes and not supported by anything else in the Record. R. at 20. The ALJ relied on Dr. Venkatesh's notes, as well as the records from other treating sources, to conclude Plaintiff suffers from ADHD and PTSD but the effects have been controlled with medication. Plaintiff's condition did not meet or equal a listed impairment so the ALJ considered the six domains of development. She found Plaintiff has less than marked limitations in the areas of acquiring and using information, attending and completing tasks, interacting and relating with others, caring for herself, and health and physical well-being. R. at 22-24.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

### A. Deference to Treating Physicians

Plaintiff first argues the ALJ erred in failing to give controlling weight to Dr. Venkatesh's IFA. Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). Dr. Venkatesh's IFA was completely inconsistent with her treating notes and offered no explanations for the conclusory statements indicated thereon. In a sense, one might conclude the ALJ *did* give controlling weight to Dr. Venkatesh's opinions as expressed in her treating notes and records. The ALJ's decision was proper.

### B. Consideration of Learning Disability

Plaintiff contends the ALJ failed to give proper consideration to her learning disability. The problem with this argument is the lack of any evidence Plaintiff suffers from a learning disability. Plaintiff was performing below grade level and had to repeat the second grade, but this does not mean Plaintiff is suffering from a diagnosable physical or mental condition that impairs her ability to learn. To the contrary, the Record demonstrates (and the ALJ found) Plaintiff's educational problems are a consequence of external events and the PTSD some of those events have caused. Finally, the ALJ properly considered the reports and records from Plaintiff's teachers and schools in evaluating her ability to function in the six domains of development.

### C. Credibility Analysis

Finally, Plaintiff contends the ALJ failed to conduct a proper credibility analysis as required by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted).

8

> While the claimant has the burden of proving that the
> disability results from a medically determinable physical or
> mental impairment, direct medical evidence of the cause and
> effect relationship between the impairment and the degree of
> claimant's subjective complaints need not be produced. The
> adjudicator may not disregard a claimant's subjective
> complaints solely because the objective medical evidence
> does not fully support them.
>
> The absence of an objective medical basis which supports
> the degree of severity of subjective complaints alleged is just
> one factor to be considered in evaluating the credibility of the
> testimony and complaints. The adjudicator must give full
> consideration to all of the evidence presented relating to
> subjective complaints, including the claimant's prior work
> record, and observations by third parties and treating and
> examining physicians relating to such matters as:
>
> > 1. The claimant's daily activities;
> > 2. the duration, frequency and intensity of the pain
> > 3. precipitating and aggravating factors;
> > 4. dosage, effectiveness and side effects of medication;
> > 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's
> subjective complaints solely on the basis of personal
> observations. Subjective complaints may be discounted if
> there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

The ALJ's analysis was appropriate. Plaintiff's mother testified to a great many matters that predate the relevant time period. To the extent she asserted some of the problems and issues she described were ongoing and not alleviated by medication, the medical records – including her own statements – are to the contrary. The ALJ was entitled to decide the mother's statements to the doctors and other treating sources were accurate and rely on them when they conflicted with the mother's testimony at the hearing.

9

## III. CONCLUSION

The ALJ's determination Plaintiff was not disabled on or after the date her application was filed is supported by substantial evidence in the record as a whole. Therefore, the Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

                                       /s/ Ortrie D. Smith
                                       ORTRIE D. SMITH, JUDGE
DATE: May 12, 2006                 UNITED STATES DISTRICT COURT